## CIRCUIT COURT OF LOUDOUN COUNTY

J. Andrew Luce
and Aimee Luce

v.

Jack Banach,
Suzanne Banach,
and Maryland
Trim & Window, Inc.

February 17, 2005

Case No. (Law) 29452

BY JUDGE JAMES H. CHAMBLIN

This case came before the Court on July 22, 2004, and January 31, 2005, for trial without a jury on claims of breach of contract, *quantum meruit*, and unjust enrichment. After consideration of the evidence, the argument of counsel, and the memoranda filed, I find that the Defendants, Jack Banach and Suzanne Banach, are personally liable to the Plaintiffs, J. Andrew Luce, D.V.M., and Aimee Luce, for breach of contract in the amount of $53,821.31.

The Defendant, Maryland Trim & Window, Inc., (MTW) is not liable to the Luces. Because liability is based upon an express contract, the causes of action for *quantum meruit* and unjust enrichment are not applicable.

*Facts*

The Banachs incorporated MTW under the laws of the State of Maryland in 1987. MTW was in the business of supplying and servicing doors and

windows. It ceased doing business other than to sell off its inventory of doors and windows on or about June 10, 2003.

While it was in business, MTW was owned by the Banachs. Mr. Banach served as president while Ms. Banach served as secretary, treasurer, and vice-president in charge of administration. Mr. Banach was involved in the actual operation of the door and window business while Ms. Banach took care of the administrative duties.

On October 6, 1998, the Comptroller of the State of Maryland forfeited the charter of MTW for nonpayment of sales taxes. The Banachs were unaware that the charter of MTW had been forfeited (and, as a result, MTW's corporate existence ceased and the corporation was dissolved) until this litigation was commenced in June 2003 (the motion for judgment was filed June 23, 2003).

On June 27, 2003, the Comptroller removed his objection to revival of the charter of MTW, and articles of revival were filed on July 21, 2003. This reinstated MTW's corporate existence. On October 8, 2004, the charter of MTW was forfeited by the Maryland Department of Assessments and Taxation. MTW is no longer in existence.

The Luces contacted Mr. Banach in the latter part of 2002 about MTW supplying windows and doors for a new house they were constructing in Loudoun County. The Luces wanted Legacy doors and windows manufactured by Weather Shield. MTW was a Weather Shield dealer.

By a fax (Plaintiffs' Exhibit 1) dated October 8, 2002, Mr. Banach provided Ms. Luce with the dimensions for the rough openings for the Weather Shield doors and windows that they were considering for their new home.

In December 2002, the Luces decided that they wanted to purchase the Weather Shield doors and windows from MTW. On December 24, 2002, Mr. Banach faxed to Ms. Luce an invoice (Plaintiffs' Exhibit 2) for the purchase of certain Legacy doors and windows at a total price of $71,467.17. Ms. Luce signed the invoice as accepted on December 27, 2002, after handwriting the following language on the last page of the invoice: "Maryland Trim & Windows guarantees that windows and doors will fit the specifications given to owner by Maryland Trim & Windows."

Ms. Luce's written acceptance was returned to MTW. MTW did not object to the handwritten language. Mr. Banach admitted during his testimony that MTW agreed to the handwritten provisions.

The Luces paid the full amount of $71,467.17 to MTW on or about December 31, 2002.

The doors and windows were manufactured by Weather Shield. They were delivered to the Luce's home site by early April 2003. The Luces had constructed rough openings for the doors following the dimensions given by Mr. Banach for MTW.

On April 14, 2003, the Luces' workmen started to install the doors. They discovered that the doors were 2½ inches too tall. The Luces rejected the doors solely because they were too tall. The doors were returned to MTW. The Luces and Mr. Banach discussed how to remedy the problem.

By an e-mail (Plaintiffs' Exhibit 4) from Ms. Luce to Mr. Banach on April 22, 2003, she stated in pertinent part:

> Please make the modifications to our doors as discussed by you [Mr. Banach] and Drew [Dr. Luce] with the final result being a door that is sized to fit the rough openings you [Mr. Banach] provided. . . .

> We want this [something from Weather Shield] signed by one of Weather Shield's officers that states that their warranty will not be voided if Maryland Trim and Windows make these modifications in Frederick, Maryland.

On April 24, 2003, Mr. Banach sent a fax (Plaintiffs' Exhibit 5) to Ms. Luce in which he proposes removing the 3½ inch spread mull between the door and the transom of each unit so that the transom will be "tight stacked" to the door. He advised that the new seal between the door and the transom would no longer be under the Weather Shield factory warranty because it would be considered a "field-stack mull." He proposed that MTW would accept full responsibility for the warranty as to the door-transom seal. He attached drawings of the proposed change and a copy of a letter from Weather Shield stating that its warranty would not cover the "field-stack" but would not otherwise be altered.

By letter (Plaintiffs' Exhibit 7) dated April 25, 2003, to Mr. Banach, the Luces wanted two issues addressed before they would agree to his proposed modifications. The issues were:

1. How MTW intends to deal with the damage that will occur when the fasteners are removed that secure the blocking to the transom and the door jamb; and

2. How to deal with the portion of the factory warranty that Weather Shield is "carving out."

The Luces and Mr. Banach discussed the modifications and the Luce's concerns. They reached a verbal agreement.

By letter (Defendant's Exhibit 8) to the Luces dated April 30, 2003, Mr. Banach put the agreement in writing. The letter, in pertinent part, states:

> Dear Drew and Aimee,
>
> I am writing to summarize the verbal agreement that we reached regarding the modification to the transom/door units for your home.
>
> Maryland Trim & Window, Inc., agrees to warrant, consistent with the terms of the Weather Shield warranty, any and all issues which are, as a result of the modifications being made by our firm, now excluded from the warranty otherwise provided by Weather Shield. Let me assure you that we do not anticipate any problems as *field stacking* is a common practice. This work will be done using Weather Shield's service guidelines and factory manufactured parts. There will be no compromise.

On May 1, 2003, the Luces signed below the following language at the end of the aforesaid letter and faxed it back to Mr. Banach:

> By our signatures below, we have agreed to accept the stacking modification proposed by Maryland Trim & Window, Inc., as referenced above and in previous correspondence and discussions.

See Defendants' Exhibit 8.

MTW secured authority from Weather Shield to modify the doors and proceeded to do so.

On May 8, 2003, the modified doors were delivered. Only a few doors were removed from MTW's delivery truck before it was discovered that the doors were now too short. All the doors were rejected and returned by the Luces. They were rejected solely because they were now too short.

Joe Luce (Dr. Luce's brother who was helping the Luces in the construction of the house – the Luces acted as their own general contractors) explained the rejection in a fax (Plaintiffs' Exhibit 9) to Mr. Banach on May 8, 2003, as follows:

This note is intended to inform you that the doors delivered to the Luce residence ("Site") have been rejected and your truck driver has been instructed to return them to your shop.

According to Mr. Jim Rosenfeld of Weather Shield, the dimensions of the door jambs are to be ½″ shorter than the rough opening height and ¾″ narrower than the rough opening width. The doors delivered to the Site today measure 95″ tall compared with the rough opening dimensions you provided in October 2002, which indicated a height of 96-½″. The discrepancy is 1″.

On May 12, 2003, the Luces faxed a letter (Plaintiffs' Exhibit 11) to Mr. Banach in which they set forth four possible options in order to achieve a proper fit for the doors. They indicated that they would only agree to two of the four, both of which involve installing a block below the door threshold. After further discussions, the Luces agreed to allow MTW to install ¾ inch block below the threshold.

MTW performed further work on the doors, and they were redelivered to the job site on May 13, 2003. Only four doors were taken off the truck and two others were inspected on the truck. For numerous reasons, the Luces again rejected the doors.

By letter (Plaintiffs' Exhibit 12) dated May 13, 2003, the Luces advised Mr. Banach of the problems with the doors which caused their rejection, as follows:

1. On all door/transom units, the transom window is out-of-plane with the face of the interior jamb of the door. The transom unit is anywhere from ⅛″ to ⅜″ out of plane.

2. The mitered joints on the aluminum cladding have tremendous gaps and sloppy, excess caulking.

3. The mitered joints on the aluminum cladding do not align.

4. The receiving grooves for the snap-in brick moldings are misaligned.

5. There are unsealed mitered joints in the aluminum cladding.

6. An excessive amount of silicone caulking has been placed between the transom and door jambs.

7. One transom unit has an 8"+ scratch in the aluminum stile of the unit.

8. Where the transom unit meets the door head, there are gaps that start at 0" and open to $^3/_{16}$" between the units.

9. The interior face of the transom jamb does not align with interior face of the door jamb on two (2) of the four (4) units checked.

10. There is damage to the finished aluminum cladding on one transom jamb.

11. We noted a door jamb on the truck for a 2" by 4" wall. It is our recollection that we do not have any 2" by 4" walls on the Project.

12. There is silicone and white caulk on the interior face of the transom and door jambs.

13. Joe noted today that, contrary to your earlier representations, the thresholds are not ¾". They include, as an integral part of the threshold on the interior face, a ⅝" piece of wood below the threshold. This ⅝" wood has to be added to any ¾" blocking and impacts the finished appearance where flooring abuts the threshold.

Photographs were taken of the condition of some of the doors. See Plaintiffs' Exhibit 13.

By fax (Plaintiffs' Exhibit 14) on May 20, 2003, Mr. Banach advised the Luces that MTW did not concede that the doors had any defects, however, he did exercise a right to cure, anticipating a redelivery within two weeks.

By letter (Plaintiffs' Exhibit 15) dated May 21, 2003, the Luces advise Mr. Banach of the following:

1. The doors as delivered were incorrect.

2. They never agreed to modification to a specific height.

3. MTW was responsible to provide doors to fit the rough opening dimensions that MTW provided in October 2002.

4. MTW had already had a reasonable opportunity to cure and deliver factory quality doors.

5. Modified door/transom units were no longer acceptable, and only factory constructed units were acceptable.

6. Only a full factory warranty from Weather Shield was now acceptable.

The Luces heard nothing from MTW. They tried to contact Mr. Banach, but they were unsuccessful. They were finally able to contact him, and, as a result, the Luces, Joe Luce, and the Banachs met at MTW's warehouse on June 5, 2003.

At the meeting, the parties initially discussed the warranty issues. Then the doors were examined. The Luces saw the same problems noted when the doors were delivered to the site on May 13, 2003. Mr. Banach admitted that there were things that MTW needed to do to the doors after the meeting. The Luces never received any response from MTW after the meeting.

Mr. Banach testified that he was waiting for some typed-up notes of the meeting from Dr. Luce that he never received.

On June 10, 2003, MTW performed its last service to customers. After that date MTW merely sold off its inventory.

On June 23, 2003, the Luces filed their motion for judgment.

### Legal Conclusions

For the reasons hereinafter set forth, I find the following:

1. MTW materially breached the twice-modified agreement to provide doors to the Luces that would fit the rough openings they had constructed following the dimensions provided by MTW.

2. MTW had a sufficiently reasonable opportunity to cure the defects in the doors, but it failed to do so.

3. All the doors supplied by MTW did not meet the terms of the contract.

4. The Luces were entitled to cover for the defective doors, they did so, and they are entitled to recover the cost of cover, $53,033.81, which they paid to Opus Sash & Door (Opus) for doors that did fit the rough openings.

5. The Luces are also entitled to recover, as consequential damages, what they paid for the five persons to be present on May 8, 2003, waiting to install the doors when defective doors were delivered, $787.50.

6. The Luces are not entitled to recover the loan extension fee of $5,000.00 because it was not a reasonably foreseeable damage when they reached the agreement with MTW in December 2002.

7. MTW was not in existence, but dissolved, from October 1998 to late June 2003; therefore, it was dissolved during the period when the subject agreement was entered into and breached.

8. Even though MTW was a Maryland corporation, because it elected to do business in Virginia, the law of Virginia applies to it and its principals.

9. The Banachs, as the owners and officers of MTW, operated its business during the period when the subject contract was entered into and breached.

10. The Banachs are personally, jointly and severally liable to the Luces in the amount for $53,821.31 for breach of contract.

11. No liability can be imposed upon MTW because it was not in existence when the subject contract was entered into and breached.

12. The liability of the Banachs is based upon the breach of an express contract; therefore, any claim based upon *quantum meruit* or unjust enrichment is not applicable.

Very significantly, in December 2002, the Luces entered into a contract with MTW for the purchase of fifteen Weather Shield Legacy doors that MTW guaranteed would fit rough openings with the dimensions provided to them by Mr. Banach on behalf of MTW. Despite two modifications to the contract because the doors were first too tall and secondly too short, MTW never, over a period of five months (the doors were to be delivered under the original contract within six weeks), provided the Luces with doors that would fit the rough opening dimensions provided by MTW. Mr. Banach's attempted exercise of an opportunity to cure after the second delivery of defective doors simply comes too late. The Luces did not have to agree to a third attempt to get the doors right, and, in fact, they did not so agree.

MTW asserts that this is a case of buyer's remorse, *i.e.*, the Luces regretted agreeing to buy the doors and wanted out of the contract. I do not agree. While it does appear that they did attempt to change the terms of the modified contract (*e.g.*, asserting in late May 2003 after the third delivery of defective doors that they now wanted a full manufacturer's warranty where they had earlier agreed to accept MTW's warranty for the seal between the door and the transom), they never agreed to accept the doors in the condition provided by MTW. The Luces never received what they bargained for, *i.e.*,

doors that fit the rough openings constructed according to the dimensions given by MTW.

The doors delivered the third time did not conform to the contract. Not only did MTW fail to correct the height defect as it had agreed, but also the doors had other defects, such as gaps, torn screens, misalignments, and excessive caulking that made the doors unacceptable in the trade. On this issue, I find the Luces' expert more credible than MTW's expert. I have some doubt that MTW's expert even inspected the doors in question.

When MTW went out of business in late June 2003, it further breached the modified contract because it would no longer be able to stand behind the warranty it gave for the seal between the door and the transom after it removed the 3½ inch spread mull. I do not accept Mr. Banach's statement that, if a warranty claim were to be made in the future, then he would turn it over to Weather Shield who would get another dealer to honor MTW's warranty. No one for Weather Shield confirmed this. Just because it may have happened in the past when other Weather Shield dealers went out of business, it does not mean that it will happen in the future in this case.

The doors supplied by MTW were nonconforming, defective, and did not meet the terms of the contract. The Luces were entitled to cover, *i.e.,* secure similar doors. They did so. They paid $53,033.81 to Opus for conforming doors. There is some evidence that the doors that the Luces secured from Opus were not exactly the same style doors that they had agreed to purchase from MTW. They may have been different in style, but there is no evidence that they were of a higher quality or more expensive than the doors ordered from MTW. The Luces are entitled to recover the full cost of cover.

The Luces are also entitled to recover any consequential damages because of the breach. Their having to pay five installers to wait for 4½ hours on May 8, 2003, at $35.00 per hour, when the doors were delivered in a defective, unusable condition is a consequential damage. It was reasonably foreseeable that, if the doors were delivered in a defective condition, then the Luces would incur a needless expense for installers who had to wait for their delivery and then would not be able to do anything with the doors. The expense might have been less if MTW had delivered the doors when it said it was going to deliver them, at 9:00 a.m.

The Luces also seek to hold MTW liable for a fee of $5,000.00 they had to pay to extend their construction loan because of the delay in construction caused by MTW's failure to deliver the correct doors. There is no evidence that anyone at MTW was aware of the terms of the Luces' construction loan, or even if they had one. This is not a foreseeable damage.

The parties agree that, under Maryland corporation law, the reinstatement of a dissolved corporation relieves the officers of any personal liability during the period of dissolution. This is certainly why MTW sought reinstatement so quickly after the Luces filed suit. The defendants argue that Maryland law should apply and the Banachs have no personal liability. I do not agree.

The Banachs and MTW deliberately and intentionally chose to do business in Virginia; doors were supplied by them to a customer in Virginia for installation in a home being constructed in Virginia. In doing so, the provisions of Article IX, Section 5, of the Virginia Constitution come into play. This section states:

> § 5. *Foreign corporations.* – No foreign corporation shall be authorized to carry on in this Commonwealth the business of, or to exercise any of the powers or functions of, a public service enterprise, or be permitted to do anything which domestic corporations are prohibited from doing, or be relieved from compliance with any of the requirements made of similar domestic corporations by the Constitution and laws of this Commonwealth. However, nothing in this section shall restrict the power of the General Assembly to enact such laws specially applying to foreign corporations as the General Assembly may deem appropriate.

A foreign corporation carrying on business in Virginia is not relieved from compliance with any of the requirements applicable to similar domestic corporations. When a foreign corporation comes into Virginia and does business here, it subjects itself to all of the laws of Virginia applicable to domestic corporations. *DuPont Co. v. Harvey Co.*, 156 Va. 582, 591 (1931).

Under *McLean Bank v. Nelson*, 232 Va. 420 (1986), if the business affairs of a dissolved corporation are carried on by the acts of certain officers, directors, or agents of a dissolved corporation, then those officers, directors, or agents can be held personally liable for contracts entered into on behalf of the dissolved corporations; and, further, such personal liability is not relieved by the reinstatement of the corporation. *McLean Bank* is based upon language in the Virginia corporation statutes, which are contrary to Maryland law, which relieves personal liability on reinstatement of the corporation.

The Banachs are found to have carried on the business of MTW while it was dissolved under Maryland law. Therefore, if MTW were a Virginia corporation, then clearly the Banachs, as officers, owners (shareholders), and agents of MTW, would be personally liable.

The defendants cite several Virginia circuit court opinions in arguing that the Banachs' personal liability is limited to the value of the assets of MTW. Neither *Trace Mountain Products, Inc. v. Special Data, Inc.*, 35 Va. Cir. 146 (Warren County 1994), nor *Crews & Hancock, P.L.C. v. RKR Health Management, Inc.*, 52 Va. Cir. 284 (City of Richmond 2000), involve debts incurred by a corporation after dissolution. Both cases involve debts that existed before the corporation dissolved. *McLean Bank* and *Moore v. Occupational Safety & Health Review Comm'n*, 591 F.2d 991 (4th Cir. 1979), make it clear that personal liability falls on officers, directors, and shareholders who carry on the business of a dissolved corporation.

As I advised counsel at the conclusion of the trial on January 31, 2005, I ruled that both Mr. and Mrs. Banach operated and carried on the business of MTW while it was dissolved. Also, any argument that Ms. Banach is not subject to the jurisdiction of this Court because she did not conduct any business in Virginia is unpersuasive. In operating a business that sold doors delivered in Virginia, she conducted business in Virginia. A single transaction is sufficient for Virginia to acquire jurisdiction. Further, Ms. Banach submitted herself to the jurisdiction of this Court when she filed defensive pleadings herein.

For the foregoing reasons, I find in favor of the Luces against the Banachs jointly and severally in the amount of $53,821.31 together with pre-judgment interest from May 13, 2003, the date of delivery of the defective doors pursuant to the second modification of the contract.